UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------X

| | |
|---|---|
| **LARRY CHAPPELL**, an individual; **ERA CHAPPELL & ASSOCIATES REALTY, LLC**, a Tennessee limited liability company<br><br>Plaintiffs,<br><br>-against-<br><br>**BANK OF AMERICA, N.A.,** a national association; **J.P. MORGAN CHASE & COMPANY, N.A.,** a national association; **WELLS FARGO BANK**, N.A., a national association; **THE PNC FINANCIAL SERVICES GROUP, INC.**, dba **PNC BANK, N.A.**, a national association; **TRUIST BANK** formerly **SUNTRUST BANK, N.A.**, a national association; and **SANTANDER BANK UK**, an international bank<br><br>Defendants. | **COMPLAINT AND JURY DEMAND** |

------------------------X

Plaintiffs, Larry Chappell and ERA Chappell & Associates Realty, LLC (together "Chappell"), through counsel, **WILLIAMS LLP**, for their Complaint against the named Defendants, alleges the following:

**PRELIMINARY STATEMENT**

1.      In this suit, Mr. Chappell, and his business, ERA Chappell, and Associates Realty LLC ("ERA"), bring this suit against the defendants listed because the defendants failed to carry out the most basic KYC checks on companies that opened nonroutine accounts with the banks. Specifically, the companies that opened accounts with Defendants did not actually exist, were

dissolved, and no business. Also, and among other red flags, the EIN provided were fake or nonexistent. All these accounts were used to defraud Mr. Chappell and his business. Had any of these banks conducted any checks, each would have known that the businesses did not exist and that the businesses were instruments of fraud.

## JURISDICTION & VENUE

2. This Court has diversity jurisdiction over the parties under 28 U.S.C. § 1332.

3. Venue in this Court is premised on 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(c)(2).

## PARTIES

4. Plaintiff, **Larry Chappell** ("Mr. Chappell"), is a veteran of the United States Armed Forces for 24 years and spent majority of his time overseas, in North Korea and Germany. Mr. Chappell returned to the United States after serving six months in Saudi Arabia as part of Operation Desert Storm. Mr. Chappell was born in Virgnia and lived in North Carolina. He currently lives in Tennessee, and he came to Tennessee as part of a military assignment where he provides services to current military personnel. Mr. Chappell is 71 years old, and he is designated as a disabled veteran.

5. Plaintiff, **ERA Chappell and Associates Realty LLC** ("ERA"), is a Tennessee limited liability company that sells and invests in real estate throughout Tennessee and throughout the United States. ERA is wholly owned by Mr. Chappell. ERA has its principal place of business at 903 Franklin Street Clarksville, Tennessee 37040.

6. Defendant, **Bank of America** ("BOA"), is a large consumer bank that conducts business

in New York and worldwide. At all relevant times, BOA did not exercise due care in opening bank accounts for fraudulent businesses. BOA has branches throughout New York and has its headquarters at 115 W 42nd Street New York, New York 10036.

7. Defendant, **JP Morgan Chase & Co.** ("Chase"), is a large consumer bank that conducts business in New York and worldwide. At all relevant times, Chase did not exercise due care in opening bank accounts for fraudulent businesses. Chase has branches throughout New York and its principal place of business is 270 Park Avenue New York, New York 10017.

8. Defendant, **Wells Fargo Bank, N.A.** ("Wells Fargo"), is a national bank with consumer and business divisions that has branches throughout New York. At all relevant times Wells Fargo did not exercise due care in opening accounts for fraudulent businesses. Indeed, Wells Fargo is known for, and it has encouraged its bankers to open accounts for businesses and individuals to gain bonuses. Wells Fargo has its headquarters at 530 5th Avenue, New York, New York a service address at 10036.

9. Defendant, **The PNC Financial Services Group Inc. dba PNC Bank, N.A.** ("PNC Bank"), is a national association that serves individuals and businesses. At all relevant times PNC Bank failed to exercise due care in opening accounts for fraudulent businesses for the purpose of committing fraud against Plaintiffs and against third parties. PNC Bank has its New York headquarters at 340 Madison Avenue New York, New York 10173.

10. Defendant, **Truist Bank formerly Sun Trust Bank, N.A.** ("Truist"), is a national bank that provides banking services to individuals and businesses across the United States and across the world. At all relevant times Truist failed to exercise due care in opening accounts for

4138-0151-5602, v. 3

fraudulent businesses for the purpose of committing fraud against Plaintiffs and against third parties. Truist, acting through its private wealth division, has a New York address at 610 5th Avenue, Suite 404 New York, New York 10020.

11. Defendant, **Santander Bank UK** ("Santander"), is an international bank that serves individuals and businesses in the United States and around the world. At all relevant times, Santander did not exercise due care in opening accounts for fraudulent businesses and for the purpose of defrauding Plaintiffs and other third parties. Santander has its headquarters at 437 Madison Avenue New York, New York 10022.

## FACTUAL ALLEGATIONS

12. Mr. Chappell is a 71-year-old former First Sergeant in the United States Army.

13. During his service, Mr. Chappell was stationed in Germany, Saudi Arabia, and South Korea.

14. Mr. Chappell spent most of his life outside of the United States.

15. Mr. Chappell returned to the United States and was stationed in Tennessee, where he lives today.

16. In January 2020, Mr. Chappell began receiving messages from Santander Bank about a estate services Santander bank was providing to his brother, Alan Chappell.

17. Santander called Mr. Chappell a number of times telling him that Alan Chappell had left him a substantial amount of money with Santander and that Santander was looking to turnover the funds to Chappell.

18. On or around July 2019, Mr. Chappell received a call (and fax) from an individual who

claimed he was an attorney in Toronto, Canada.

19. This individual stated he was working with Santander bank and was working to get the amounts sent to Mr. Chappell.

20. Mr. Chappell requested additional information about the account, and he asked Santander whether the account had been established by a trust.

21. Three or four days later, Grace Bishop, an individual from Santander Bank, emailed Mr. Chappell on **19 July 2019**.

22. Grace Bishop represented that she was a client relationship specialist and that she worked in the audit department at Santander Bank.

23. Grace Bishop used the email address info@santanderaudits.com.

24. Grace Bishop claimed to have worked with Randolph Brown.

25. Mr. Chappell called Randolph Brown.

26. After speaking with Randolph Brown, Mr. Chappell requested information about Santander bank and wanted to know whether the escrow or trust account had been established by his brother, Alan Chappell.

27. Santander provided Mr. Chappell with the account information and provided him him with ability to log into the account to determine whether the account was real and whether the funds that Santander claimed were in the account were actually in the account.

28. Mr. Chappell was able to log into the account with Santander Bank, and he was provided these instructions about logging into the account at Santander via email:

   Attn:  Mr. Larry Chappell,

> To login to our internet banking, please Visit:
> Website: http://Santb.co.uk/login/
> Account No.: 0178999651
> Password: aviva778
> Thank you for banking with us.
> Sincerely,
>
> Online Team

29.     Mr. Chappell was able to log into the account at Santander and take screenshots of the account.

30.     The account showed that it had a balance of $9,858,624.00.

31.     The account had a Sort Code of 20-36-16, an account number of 0178999651, a Swift BIC No. CarCGB22, and has this IBAN No.: IBANGB28 BARC20361610584978.

32.     The account was a trust account in the name of Mr. Chappell's brother, Alan Chappell.

33.     The account was a Trust Account and had an account number RC-096859.

34.     Santander allowed its bank to be used as an instrument of fraud because, like the other Bank Defendants, they failed to conduct basic checks on their clients to ensure that their clients were who they said they were and that these clients, all of which were companies, were properly formed under existing laws.

35.     Soon after allowing Mr. Chappell to access the account online, and soon after Mr. Chappell gained confidence that the funds had indeed been left to him by his brother, Grace Bishop began seeking certain fees to release the nearly $10 million dollars to Mr. Chappell.

36.     Grace Bishop provided wire information to Mr. Chappell.

37.     On **26 July 2019**, Mr. Chappell wired **$74,960.00** to D & J Magna Corp. at its **Wells Fargo** account number ending in **2157**.

38.     D & J Magna Corp. was never organized under the laws of the state of Georgia.

39.     Despite not being organized under the laws of the state of Georgia, Wells Fargo nevertheless opened an account for D & J Magna.

4138-0151-5602, v. 3

40. Wells Fargo should have had checks in place to determine whether a company was a validly existing company under the laws of the state in which the company claimed to have been doing business.

42. Wells Fargo did not properly train its employees to vet companies that were opening bank accounts at Wells Fargo.

43. When these accounts were being opened, Wells Fargo was engaged in a scheme whereby it pushed its employees to open bank accounts to raise general income for Wells Fargo and its employees.

44. Mr. Chappell sent additional wires to a companies named Akeebe Enterprises, Inc., and Raygold Global Resources LLC.

45. The wire information was for two companies: Raygold Global Resources LLC ("Raygold") and Akeebe Enterprises Inc. ("Akeebe")

46. Raygold is a Georgia limited liability company that was formed on **14 March 2019**, and dissolved on **22 October 2020**; its Registered Agent is Albert Phillips, and it claimed to have provided architectural services.

47. Akeebe is a Georgia corporation that was formed on **11 August 2020** and dissolved on **30 September 2021**; its Registered agent was Akeem Benjamin, and it claimed to have provided services relating to wholesale trade agents and brokers.

48. Raygold had a business bank account at **Wells Fargo** with an account number ending in **5968**.

49. On **19 September 2019**, Mr. Chappel wired **$92,500.00** to Raygold at its Wells Fargo

account.

50. On **20 September 2019**, Mr. Chappell wired **$20,000.00** to Akeebe at its bank account at SunTrust (now Truist) ending in **9982**.

51. **23 October 2020**, Mr. Chappell wired **$9,136.00** to Akeebe's account at Truist ending in **9982**.

52. On **11 November 2020**, Mr. Chappell wired **$25,000.00** to Akeebe's account at SunTrust Account ending in **9982**.

53. Grace Bishop represented that the funds were for cause Santander bank to release $15 million dollars to Mr. Chappell.

54. After Mr. Chappell wired a total of **$112,500.00** on **19-20 September 2019**, Grace Bishop came back to Mr. Chappell seeking additional amounts to have the insurance policy released to him.

55. On **21 February 2020**, Mr. Chappell wired **$90,000.00** to Curtis-B Global LLC ("Curtis").

56. On **2 April 2020**, Mr. Chappell wired an additional **$40,000.00** to Curtis.

57. Curtis was a Georgia limited liability company that was formed on **2 July 2019 and** dissolved on **22 October 2020**; its registered agent was Anthony Curtis Bailey.

58. On **July 21, 2020**, Grace Bishop caused Mr. Chappell to wire **$20,000.00** to a company called Lorojo Inc. ("Lorojo"), which had an account at **Wells Fargo** ending in account number **2494**.

59. Lorojo was formed on **12 July 2010** and dissolved on **31 December 2015**; its

registered agent was Lawrence Steven Weiss.

60. On **17 October 2022**, Mr. Chappell wired **$107,680.00** to Del Procurement Services LLC ("Del") at its account at Wells Fargo ending in **5773**.

61. Del is a Georgia limited liability.

62. Lorojo did not exist when Wells Fargo opened an account for it.

63. Grace Bishop represented herself as an employee of Santander bank.

64. Grace Bishop told Mr. Chappell that his recently deceased brother, Alan Chappell, had left an insurance policy in Mr. Chappell's name as the beneficiary of that policy.

65. Alan Chapell, who lived in Canada, was the only known relative Mr. Chappell had.

66. Mr. Chappell wanted to check to determine whether it was indeed accurate that Santander had an insurance policy of which he was a beneficiary.

67. On Monday, 6 January 2020, a Santander employee, Patrick Gill, wrote Mr. Chappell and represented that it was true that there was an insurance policy of which Mr. Chappell was a beneficiary and that Mr. Chappell had to pay certain funds to release the insurance policy.

68. Patrick Gill's email states as follows:

> Dear Mr. Larry Chappell,
>
> In compliance with our coordinates with Mrs. Grace Bishop, we demand the payment for the Certificate Index Origin of Funds of the Insurance Policy processed under your name before we can approve the outgoing international transfer from our head office to your nominated bank account in the USA. We do not accept your continuous compromise with Mrs. Grace Bishop and state further that we are determined to ensure that we carry out the release of this insurance policy under the approved British Banking Association guidelines, ethics [sic] and proper mode of operation. The forms as provided by the Chancellor of the Exchequer that has been forwarded to Mrs. Grace Bishop should be filled carefully and returned back to this head office immediately with

the fees. Upon receipt of the fees ($141,298) we shall credit your bank account in [sic] USA with the insurance policy funds valued at the sum of ($15,712,000). Under the banking provisions of the United Kingdom, the $141,298 should be paid within the next (7) working days otherwise we shall approve the confiscation of the insurance policy to the British Treasury. Santander Bank head office swift department monitor all insurance and bond claims payment and all outgoing international remittance in compliance with the British banking regulations and the Origin of funds are provided appropriately and submitted to British Government. Defaulters are given appropriate punitive measures.

Your faithfully,

Mr. Patrick Gill
+44 7770135764

69. This email came from the email address Patrick.gill@santander.co.uk.

70. Mr. Chappell checked to ensure that the email address was real and confirmed that the email address was real.

71. The email address from which Patrick Gill emailed Mr. Chappell matches the format of emails that Santander files with the Securities and Exchange Commission's Edgar system.

72. After receiving Patrick Gill's email, Mr. Chappell called the number at the end of Patrick Gill's email and spoke with Patrick Gill who assured Mr. Chappell that the insurance policy awaited him, but he would have to pay the required funds.

73. Specifically, a Santander employee named Patrick Gill, who had an email address Patrick.gill@santander.co.uk, emailed My. Chappell stated there was an insurance policy owned by his brother, Alan Chappell.

74. Mr. Chappell separately called Santander bank and spoke to Santander about the transaction and Santander

75. When Mr. Chappell returned to America, the military stationed him in Tennessee to provide them ability the was stationed in Tennessee, where he helps veterans and current army personnel with adjusting to civilian life.

76. Mr. Chappell wired the following additional amounts to Wells Fargo escrow or business accounts for companies that did not exist, for companies that were defunct, and for companies whose owners did not exist:

    a. $15,000.00;
    b. $39,280.00;
    c. $109,984.00
    d. $94,272.00
    e. $19,800.00
    f. $16,500.00
    g. $101,340.00
    h. $39,900.00
    i. $23,000.00
    j. $42,500.00
    k. $34,000.00
    l. $18,000.00
    m. $39,168.00
    n. $5,529.00
    o. $20,000.00
    p. $26,650.00

77. Mr. Chappell sent an additional $46,360.00 to Bank of America for companies that Bank of America claimed to have had an escrow or business account with Bank of America but in fact that companies did not exists, its owners were not the individuals who were represented to be its owners, and the companies were defunct or delinquent on the secretary of state website.

78. Mr. Chapell sent the following additional amounts to Chase Bank for companies that

4138-0151-5602, v. 3

did not exist, for companies that were defunct, and for companies whose owners were not who they were represented to be:

    a.    $99,326.00
    b.    $47,136.00
    c.    $13,000.00
    d.    $8,120.00

79. Mr. Chappell sent $5,750.00 to PNC Bank for companies that PNC Bank claimed to have had an escrow or business account with Bank of America but in fact that companies did not exists, its owners were not the individuals who were represented to be its owners, and the companies were defunct or delinquent on the secretary of state website.

80. Mr. Chappell wired an additional $31,424.00 to PNC Bank for the benefit of ET&M LLC, a company that claimed to have been established in Maryland.

81. ET&M LLC is defunct, and it was defunct at the time PNC allowed that company to open an account with it.

82. ET&M LLC is a fictitious name, and it claimed to operate a shipping business from its apartment.

83. PNC did not conduct the proper KYC check on ET&M LLC or on any other entity.

84. PNC did not obtain the proper and necessary information to open and operate a business account.

85. PNC did not do any of the proper security checks on any of the entities in whose name it opened a business account.

86. Each bank charged a wire fee ranging from $25.00 to $40.00.

87. JP Morgan Chase charged Mr. Chappell the highest wire transfer fee of $40.00.

88. Wells Fargo charged a wire transfer fee of $25.00.

89. PNC charged a wire transfer fee of $20.00.

90. The companies that were established at the banks were not real entities in that they had been set up without the proper information.

91. The entities did not have a valid EIN number, and the banks did not ask for the proper (and basic) information to open the account.

92. All the Bank Defendants did not want to know the true owner of the business accounts that were being established.

93. The paperwork supplied to each of the bank defendants was: (i) forged; (ii) incomplete; and (iii) included information that was incorrect, among other defects.

94. Had the banks properly undertaken the requirements imposed on them before opening business and escrow accounts, Mr. Chappell would not have suffered the severe financial losses that he has suffered.

95. Based on the paperwork submitted, the individuals who opened the bank account in the names of the business were clearly unsophisticated individuals.

## CLAIMS FOR RELIEF

### COUNT I: NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

96. Plaintiffs re-allege each preceding allegation as if those allegations were set forth in this paragraph.

97. Each of the bank defendants had a duty to ensure that: (i) the companies for which they

opened escrow and other accounts were validly existing companies consistent with federal and state laws; (ii) the formation documents were valid; (iii) the Registered Agents and the individuals on the bank accounts were who they represented themselves to be; (iv) the business were legitimate businesses that could open escrow and business accounts; (v) the accounts were properly operated consistent with existing federal and state banking laws and regulations; (vi) the banks exercised the proper controls in monitoring the accounts that were opened; and (vii) the nature of the accounts the banks allowed to be opened and exploited required additional regulation with which the banks failed to comply.

98.    In the specific case of Santander Bank, it allowed an escrow account to be opened without properly checking on who that account was used. The login information was provided to third parties all over the world who were accessing the accounts without Santander imposing any checks or following existing regulations.

99.    In the case of Bank of America, J.P. Morgan Chase & Company, N.A., Truist Bank formerly SunTrust Bank, The PNC Financial Services Group Inc., each bank opened accounts in the names of entities that they knew (or should have known—had they conducted the most rudimentary checks) that these companies were not legitimate companies and they should have never allowed them to open bank accounts.

100.   Each bank breached duties owed to Plaintiffs by allowing these companies and individuals to open non-routine bank accounts in the names of business that either did not exist or that were defunct at the time the accounts were opened. Also, the banks breached the duty of care to Plaintiffs when they allowed their institutions to be used as instruments of fraud.

101.   The banks' negligence was the proximate cause of the damages Plaintiffs suffered.

102.   Plaintiffs have suffered damages in an amount to be proven at trial.

### COUNT II: EQUITABLE FRAUD
### (AGAINST ALL DEFENDANTS)

103.   Plaintiffs re-allege each preceding allegation as if those allegations were in this paragraph.

104.   Each bank made a material misrepresentation to Mr. Chappell in that before he wired funds to the specific business account, each bank stated that the company to which Mr. Chappell was wiring was in good standing and was doing legitimate business with the bank. In addition, by letting the banks do business at their institutions, the banks were representing that those businesses were legitimate and that they had gone through certain checks to do business at the respective bank.

4138-0151-5602, v. 3

105. The banks knew these representations were false because they knew that they had deliberately failed to conduct any of the checks and the KYC requirements that they had to perform.

106. The banks intended that Mr. Chappell rely on these representations and Mr. Chappell did rely on these representations.

107. Mr. Chappell's reliance on the representations was justified and he had no reason to doubt the bank's representations.

## COUNT III: UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

108. Plaintiffs re-allege each preceding allegation as if those allegations were in this paragraph.

109. All the banks earned certain fees from the transactions that Mr. Chappell undertook in the form of wire transfer fees and in the form of bonusses for opening non-routine accounts, even if those accounts were not legitimate accounts.

110. The benefits in terms of fees and bonuses were earned under circumstances that make it unjust for the banks to retain the benefit.

111. Equity and good conscience require restitution to Mr. Chappell.

112. Mr. Chappell suffered damages in an amount to be proven at trial.

Dated:    New York, New York
          17 September 2024

*Respectfully submitted*,

**WILLIAMS LLP**

*/s/ T. Edward Williams, Esq.*
45 Rockefeller Plaza 20th FL.
New York, New York 10111
Tel.:    212.417.0430 (Main)
         212.417.0431 (Direct)
Fax:    212.417.0433
Edward@williamsllp.com
*Attorney for Plaintiffs*