UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – X

LARRY CHAPPELL, an individual; ERA    :
CHAPPELL & ASSOCIATES REALTY, LLC, a :
Tennessee limited liability company    :
               Plaintiffs,    :
                      :
          -against-    :
                      :
BANK OF AMERICA, N.A., a national .
association; J.P. MORGAN CHASE &
COMPANY, N.A., a national association;
WELLS FARGO BANK, N.A., a national
association; THE PNC FINANCIAL SERVICES
GROUP, INC., dba PNC BANK, N.A., a
national association; TRUIST BANK formerly
SUNTRUST BANK, N.A., a national
association; and SANTANDER BANK UK, an
international bank

               Defendants.

– – – – – – – – – – – – – – – – – – – – – – – – X

No. 24 CV 07056 (JGLC)

AMENDED COMPLAINT
AND JURY DEMAND

     Plaintiffs, Larry Chappell and ERA Chappell & Associates Realty, LLC (together, Mr.

Chappell" or "Plaintiffs"), through counsel, **WILLIAMS LLP**, for their Complaint against

Defendants, allege the following:

## PRELIMINARY STATEMENT

1.    Mr. Chappell, and his company, ERA Chappell and Associates Realty LLC ("ERA"),

sue the banks because the banks are liable to him for allowing fake companies to open non-

routine accounts to defraud Mr. Chappell and other third parties. In the case of Santander

Bank, in addition to allowing fake businesses to set up accounts with it, Santander also allowed

its employees it to spoof its email and bank accounts even though Santander knew in 2019, if not earlier, that its bank accounts and emails had been spoofed. The banks are therefore liable to Plaintiffs for negligence, for equitable fraud, and for unjust enrichment.

## JURISDICTION & VENUE

2.      This Court has diversity jurisdiction over the parties under 28 U.S.C. § 1332.

3.      Venue in this Court is premised on 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(c)(2).

## PARTIES

4.      Plaintiff, **LARRY CHAPPELL** ("Mr. Chappell"), is a veteran of the United States Army. He served in the Army for 24 years, and he was stationed in North Korea and Germany. Mr. Chappell also served for six months in Saudi Arabia as part of Operation Desert Storm. Mr. Chappell was born in Virginia, and he has also lived in North Carolina. He lives in Tennessee, and he came to Tennessee as part of a military assignment where he provides services to current military personnel. Mr. Chappell is 71 years old, and he is designated as a disabled veteran.

5.      Plaintiff, **ERA CHAPPELL AND ASSOCIATES REALTY LLC** ("ERA"), is a Tennessee limited liability company that sells and invests in real estate throughout Tennessee and throughout the United States. Mr. Chappell owns ERA. ERA has its principal place of business at 903 Franklin Street, Clarksville, Tennessee 37040.

6.      Defendant, **BANK OF AMERICA** ("BOA"), is a large bank that conducts business in

4138-0151-5602, v. 10

New York and worldwide. At all relevant times, BOA did not exercise due care in opening bank accounts for fake businesses. BOA has branches throughout New York and has its headquarters at 115 W 42nd Street, New York, New York 10036.

7.      Defendant, **JP MORGAN CHASE & CO.** ("Chase"), is a large bank that conducts business in New York and worldwide. At all relevant times, Chase did not exercise due care in opening bank accounts for fake businesses. Chase has branches throughout New York and its principal place of business is 270 Park Avenue, New York, New York 10017.

8.      Defendant, **WELLS FARGO BANK, N.A.** ("Wells Fargo"), is a national bank with consumer and business divisions that has branches throughout New York. At all relevant times Wells Fargo did not exercise due care in opening accounts for fake businesses. Wells Fargo is known for, and it has encouraged its bankers to, open accounts for businesses and individuals to gain bonuses. Wells Fargo has its headquarters (and a service address) at 530 5th Avenue, New York, New York 10036.

9.      Defendant, **THE PNC FINANCIAL SERVICES GROUP INC. DBA PNC BANK, N.A.** ("PNC"), is a national association that serves individuals and businesses. At all relevant times PNC Bank did not exercise due care in opening accounts for fake businesses for the purpose of committing fraud against Plaintiffs and against third parties. PNC Bank has its New York headquarters at 340 Madison Avenue, New York, New York 10173.

10.      Defendant, **TRUIST BANK FKA SUNTRUST BANK, N.A.** ("Truist"), is a national bank that provides banking services to individuals and businesses across the United States and across the world. At all relevant times Truist did not exercise due care in opening accounts for

fake businesses for the purpose of committing fraud against Plaintiffs and against third parties. Truist, acting through its private wealth division, has a New York address at 610 5th Avenue, Suite 404 New York, New York 10020.

11.     Defendant, **SANTANDER BANK UK** ("Santander"), is a Foreign Bank Organization (or a Foreign Banking Company), that provides services throughout New York through its various subsidiaries, affiliates (including Santander Holding USA "SHUSA"), assigns, officers, directors, and other individuals and entities authorized to act on its behalf. Pursuant to New York Banking Regulations, Santander bank keeps a Registered Agent in Delaware and in Boston. At all relevant times, Santander did not exercise due care in opening non-routine accounts for fake businesses and for individuals who intended to defraud Plaintiffs. Santander UK operates in the United States through SHUSA. In addition to service addresses in Delaware and Boston, Santander may also be served at 437 Madison Avenue New York, New York 10022.

### GENERAL ALLEGATIONS

12.     Mr. Chappell is a 71-year-old former First Sergeant in the United States Army.

13.     During his service, Mr. Chappell was stationed in Germany, Saudi Arabia, and South Korea.

14.     Mr. Chappell spent most of his adult and professional life outside of the United States.

15.     Mr. Chappell returned to the United States and was stationed in Tennessee, where he lives today.

16.     In January 2019, Mr. Chappell began receiving messages from Santander Bank about

estate services Santander Bank was providing to his brother, Alan Chappell.

17.    The communications came from Santander and were marked with Santander's branding, including Santander's logo, Santander's telephone numbers in the United Kingdom.

18.    Santander called Mr. Chappell several times, telling him that Alan Chappell had left him nearly $10 million dollars in Santander's Trust and Estates Department, and that Santander was looking to turn over the funds to Mr. Chappell.

19.    On or around July 2019, Mr. Chappell received a call (and a fax) from an individual who claimed he was an attorney in Toronto, Canada.

20.    This individual stated he was working with Santander Bank and was working to get the amounts sent to Mr. Chappell.

21.    Mr. Chappell requested more information about the account, and he asked Santander whether the account had been established by a trust.

22.    Grace Bishop, an individual from Santander Bank, emailed Mr. Chappell on **19 July 2019**.

23.    Grace Bishop provided the information Mr. Chappell had requested about the account.

24.    Grace Bishop represented that she was a client relationship specialist and that she worked in the audit department at Santander Bank.

25.    Grace Bishop used the email address info@santanderaudits.com.

26.    Grace Bishop claimed she worked with Randolph Brown as an employee of Santander.

27.    Mr. Chappell called Randolph Brown.

28.    Around this same time—July 2019—Mr. Chappell also called Santander Bank at its

London office, telling Santander Bank that he had been provided with certain account information, and that he wanted to verify the account information with Santander Bank.

29.    Santander Bank told Mr. Chappell that the account was real.

30.    Santander Bank did not tell Mr. Chappell that there had been individuals impersonating or spoofing its accounts and emails.

31.    Mr. Chappell requested additional information about the trust account of which he was the beneficiary.

32.    Grace Bishop provided Mr. Chappell with the account information and granted him access to log into the account to determine if the account was real and to see that the funds were in the account.

33.    Mr. Chappell was able to log into the account with Santander Bank, and he was provided this instruction to log into the Santander account:

> Attn:   Mr. Larry Chappell,
> To login to our internet banking, please Visit:
> Website: http://Santb.co.uk/login/
> Account No.: 0178999651
> Password: aviva778
> Thank you for banking with us.
> Sincerely,
>
> Online Team

34.    Mr. Chappell took screenshots of the balance in the account.

35. The account showed that it had a balance of $9,858,624.

36.    The account had a Sort Code of 20-36-16, an account number of 0178999651, a Swift BIC No. CarCGB22, and had this IBAN No.: IBANGB28 BARC20361610584978.

37.    The account was a trust account in the name of Mr. Chappell's brother, Alan Chappell.

38.    The trust associated with the account was RC-096859.

39.    Santander Bank allowed its bank to be an instrument of fraud because, and like the other banks named in this suit, Santander did not conduct basic checks on their clients and on prospective clients.

40.    Soon after allowing Mr. Chappell to access the account online, Mr. Chappell gained confidence that the funds had indeed been left to him by his brother, Alan Chappell.

41.    Grace Bishop represented that she was an employee of Santander Bank.

42.    Mr. Chappell's deceased brother, Alan Chappell, had lived overseas, and, although Mr. Chappell and his brother lost contact while Mr. Chappell was serving in the military, Mr. Chappell's brother was fond of Mr. Chappell.

43.    Grace Bishop told Mr. Chappell that the funds were left as part of an insurance policy.

44.    The insurance payment, Grace Bishop said, had been paid to Santander Bank.

45.    Mr. Chappell confirmed that Grace Bishop was affiliated with Santander Bank by calling and confirming this fact with Santander Bank.

46.    After Mr. Chappell spoke with Santander Bank, and after he saw the balance in the Santander Bank account, Mr. Chappell believed that the funds were available for distribution to him.

47.    At this time, Grace Bishop told Mr. Chappell that to release the funds to him, Grace Bishop would have to pay certain fees related to releasing the funds as required by Santander Bank.

48.    Grace Bishop (and others) opened bank accounts for several fake companies.

49.    After opening those bank accounts for fraudulent companies, Mr. Chappell provided wiring instructions to Mr. Chappell.

50.    On **26 July 2019**, Mr. Chappell wired **$74,960.00** to D & J Magna Corp. at its **Wells Fargo** account ending in **2157**.

51.    D & J Magna Corp. was never organized under Georgia law.

52.    Despite not being organized under Georgia law, Wells Fargo opened an account for D & J Magna.

53.    Wells Fargo had checks and procedures in place to determine whether companies opening business and escrow accounts were legitimate businesses.

54.    Wells Fargo did not train its employees to vet companies that were opening bank accounts at Wells Fargo.

55.    When these accounts were being opened, Wells Fargo was engaged in a scheme under which it pushed its employees to open bank accounts to raise general income for Wells Fargo and its employees.

56.    Mr. Chappell sent additional wires to a companies named Akeebe Enterprises, Inc., and Raygold Global Resources LLC.

57.    The wire information was for two companies: Raygold Global Resources LLC ("Raygold") and Akeebe Enterprises Inc. ("Akeebe").

58.    Raygold was a Georgia limited liability company that was formed on **14 March 2019**, and dissolved on **22 October 2020**; its Registered Agent is Albert Phillips, and it claimed to

have provided architectural services.

59.    The address provided for Raygold and Akeebe were fake addresses in that no business activities occurred at the addresses.

60.    In fact, the addresses were apartment complexes with no business locations.

61.    Akeebe is a Georgia corporation that was formed on **11 August 2020** and dissolved on **30 September 2021**; its Registered Agent was Akeem Benjamin, and it claimed to have provided services relating to wholesale trade agents and brokers.

62.    Akeem Benjamin was not actually associated with Akeebe.

63.    Akeem Benjamin did not live at the address that Akeebe provided to the banks that opened accounts for Akeebe.

64.    Raygold had a business bank account at **Wells Fargo** with an account number ending in **5968**.

65.    On **19 September 2019**, Mr. Chappel wired **$92,500** to Raygold at its Wells Fargo account.

66.    On **20 September 2019**, Mr. Chappell wired **$20,000** to Akeebe at its bank account at Truist (formerly SunTrust) ending in **9982**.

67.    **23 October 2020**, Mr. Chappell wired **$9,136** to Akeebe's account at Truist ending in **9982**.

68.    On **11 November 2020**, Mr. Chappell wired **$25,000** to Akeebe's account at Truist account ending in **9982**.

69.    After Mr. Chappell wired an additional total of **$112,500** on **19-20 September 2019**,

Grace Bishop came back to Mr. Chappell seeking additional amounts to have the insurance policy released to him.

70.    On **21 February 2020**, Mr. Chappell wired **$90,000** to Curtis-B Global LLC ("Curtis").

71.    On **2 April 2020**, Mr. Chappell wired an additional **$40,000** to Curtis.

72.    Curtis was a Georgia limited liability company that was formed on **2 July 2019 and** dissolved on **22 October 2020**; its registered agent was Anthony Curtis Bailey.

73.    There is no legitimate person name Anthony Curtis Bailey doing business through Curtis-B Global LLC.

74.    The individual named Anthony Curtis Bailey did not have valid identification documents.

75.    On **July 21, 2020**, Mr. Chappell wired **$20,000** to a company called Lorojo Inc. ("Lorojo"), which had an account at **Wells Fargo** ending in account number **2494**.

76.    Lorojo was formed on **12 July 2010** and dissolved on **31 December 2015**; its registered agent was Lawrence Steven Weiss.

77.    On **17 October 2022**, Mr. Chappell wired **$107,680** to Del Procurement Services LLC ("Del") at its account at Wells Fargo ending in **5773**.

78.     Del is a Georgia limited liability company.

79.    Lorojo did not exist when Wells Fargo opened an account for it.

80.    On Monday, 6 January 2020, a Santander employee, Patrick Gill, wrote Mr. Chappell and represented that it was true that there was an insurance policy of which Mr. Chappell was

a beneficiary and that Mr. Chappell had to pay certain funds to release the insurance policy.

81.     Patrick Gill's email states as follows:

Dear Mr. Larry Chappell,

In compliance with our coordinates with Mrs. Grace Bishop, we demand the payment for the Certificate Index Origin of Funds of the Insurance Policy processed under your name before we can approve the outgoing international transfer from our head office to your nominated bank account in the USA. We do not accept your continuous compromise with Mrs. Grace Bishop and state further that we are determined to ensure that we carry out the release of this insurance policy under the approved British Banking Association guidelines, ethics [sic] and proper mode of operation. The forms as provided by the Chancellor of the Exchequer that has been forwarded to Mrs. Grace Bishop should be filled carefully and returned back to this head office immediately with the fees. Upon receipt of the fees ($141,298) we shall credit your bank account in [sic] USA with the insurance policy funds valued at the sum of ($15,712,000). Under the banking provisions of the United Kingdom, the $141,298 should be paid within the next (7) working days otherwise we shall approve the confiscation of the insurance policy to the British Treasury. Santander Bank head office swift department monitor all insurance and bond claims payment and all outgoing international remittance in compliance with the British banking regulations and the Origin of funds are provided appropriately and submitted to British Government. Defaulters are given appropriate punitive measures.

Your faithfully,

Mr. Patrick Gill
+44 7770135764

82.     This email came from the email address Patrick.gill@santander.co.uk.

83.     If Patrick Gill was not employed by Santander Bank, Santander Bank did not disclose this fact to Mr. Chappell when he called Santander Bank to inquire about the account.

84.     Mr. Chappell checked to ensure that the email address was real and confirmed that the email address was real.

85.     The email address from which Patrick Gill emailed Mr. Chappell matches the format of

4138-0151-5602, v. 10

emails that Santander files with the Securities and Exchange Commission's Edgar system.

86.    After receiving Patrick Gill's email, Mr. Chappell called the number at the end of Patrick Gill's email and spoke with Patrick Gill who assured Mr. Chappell that the insurance policy was available for him, but he would have to pay the required funds.

87.    Mr. Chappell's calls to Santander Bank should have alerted Santander that its account, logo, slogan, or documents were being used to carryout an extensive fraud.

88.    Santander Bank did not tell Mr. Chappell that its account had been misused.

89.    Santander Bank did not send out a general announcement alerting the public that its employees (or former employees) had been using its accounts to defraud third parties.

90.    Mr. Chappell separately called Santander Bank and spoke to it about the transactions.

91.    Mr. Chappell wired these additional amounts to Wells Fargo escrow or business accounts for fake companies:

|     |     |
| --- | --- |
| a. | $15,000.00; |
| b. | $39,280.00; |
| c. | $109,984.00 |
| d. | $94,272.00 |
| e. | $19,800.00 |
| f. | $16,500.00 |
| g. | $101,340.00 |
| h. | $39,900.00 |
| i. | $23,000.00 |
| j. | $42,500.00 |
| k. | $34,000.00 |
| l. | $18,000.00 |
| m. | $39,168.00 |
| n. | $5,529.00 |
| o. | $20,000.00 |
| p. | $26,650.00 |

4138-0151-5602, v. 10

92.    Mr. Chappell sent an additional $46,360.00 to BOA for fake that BOA allowed to open accounts with it.

93.    Mr. Chapell sent the following additional amounts to Chase for fake companies that Chase allowed to open accounts with it:

    a.    $99,326.00
    b.    $47,136.00
    c.    $13,000.00
    d.    $8,120.00

94.    Mr. Chappell sent an additional $5,750.00 to PNC for fake companies that PNC allowed to open accounts with it.

95.    Mr. Chappell wired an additional $31,424.00 to PNC for the benefit of ET&M LLC ("ETM"), a company that claimed to have been established in Maryland.

96.    ETM is defunct, and it was defunct at the time PNC allowed it to open an account.

97.    ETM is a fictitious name, and it claimed to operate a shipping business from an apartment.

98.    PNC did not conduct any KYC or CDD check on ETM or on any other entity.

99.    PNC did not obtain the proper and necessary information to open and operate a business account.

100.    PNC did not do any of the proper security checks on any of the entities in whose name it opened a business account.

101.    Each bank charged a wire fee ranging from $25 to $40.

102.    Chase charged Mr. Chappell the highest wire transfer fee of $40.

4138-0151-5602, v. 10

103.    Wells Fargo charged a wire transfer fee of $25.

104.    PNC charged a wire transfer fee of $20.

105.    The entities did not have a valid EIN number, and the banks did not ask for the proper (and basic) information to open the account.

106.    The banks did not want to know the true owner of the business accounts that were being established.

107.    The documents supplied to each of the bank were: (i) forged; (ii) incomplete; and (iii) included information that was incorrect.

108.    Had the banks properly undertaken the requirements imposed on them before opening business and escrow accounts, Mr. Chappell would not have suffered the severe financial losses that he has suffered.

## ALLEGATIONS RELEVANT TO COMPANIES
## THAT OPENED ACCOUNTS

109.    Grace Bishop formed Akeebe, Curtis, D&J Magna, Del, ET&M, Lorojo Inc., and Raygold to defraud Mr. Chappell and his company.

110.    These companies were formed using addresses that belonged to other individuals.

111.    The addresses provided were fake addresses or addresses to apartment complexes.

112.    The individuals who were represented to be the registered agents for the companies were either dead or had no idea that they were designated as registered agents.

113.    Each bank had a duty to know the companies that were opening bank accounts with it.

114.    Each bank needed to request documents, valid identification, corporate records, and

other information about the companies for which they were opening bank accounts.

115.   Akeebe, Curtis, D&J Magna, Del, ETM, Lorojo Inc., and Raygold would have never opened accounts if the named banks had fulfilled their basic obligations.

116.   Each company had sought to open non-routine bank accounts in that they were seeking to open escrow accounts, trust accounts, and other business accounts.

117.   The absence of information and the presence of forged and incorrect documents should have alerted the banks as to the fraud by the companies.

118.   Had any of the banks named in this suit requested the documents needed to open an account or had any of the banks been curious about the information they were being provided, they would have uncovered the fraud.

119.   Most of the registered agents could not even have a valid driver's license because of their criminal history.

120.   For the companies that claimed to have been providing professional services, the banks did not check to see whether those companies were providing the services they claimed to have been providing.

121.   For example, Del claimed to have been providing real estate services, but this representation was false.

122.   Del instead cloned information from another website and provided that information to the banks named in this suit.

123.   A basic Google check (not to mention making use of the sophisticated systems to which the banks have access) would have uncovered that Del does not have a real estate business,

that it has never had any listings, and that it did not have any owners or employees who had a real estate license in the State of Georgia or elsewhere.

124.   Lorojo, as just one example, did not even exist.

125.   Raygold could not explain its business.

126.   Raygold claimed to have a "global" business but provided no other information.

127.   In total, and not including punitive damages, attorneys' fees and costs, Mr. Chappell wired more than $1.3 million dollars to the banks named in this suit.

128.   The monies wired to the banks were monies that belonged to Mr. Chappell and his company.

129.   Mr. Chappell borrowed some of the money transferred to the banks at extremely high interest rates.

## ALLEGATIONS RELEVANT
## TO THE BANK DEFENDANTS

130.   Each bank named in this suit is regulated by the Uniting and Strengthening America by Providing Appropriate Tools ("Patriot Act"), Pub. L. 107-56, 115 Stat. 272 (2001), the Bank Secrecy Act, 31 U.S.C. 5311, as amended by the Rules and Regulations promulgated by the Financial Crimes Enforcement Network ("FinCEN") housed in the Treasury Department.

131.   At minimum, the Patriot Act and the FinCEN Rules and Regulations require that each bank have the following systems in place:

- A system of internal control to ensure ongoing compliance;
- Independent testing of compliance that is either conducted by bank personnel or by an outside third party;

- Designation of an individual (or individuals) responsible for day-to-day compliance;
- Providing the appropriate personnel; and
- Implementing risk-based procedures for ongoing CDD, including: (i) understanding the nature and purpose of customer relationships for developing customer risk profiles; and (ii) conducting ongoing monitoring to identify and report suspicious transactions, and, on a risk basis, to maintain and update customer information (including information about the beneficial owners of legal-entity customers).

132.   To fulfill the obligations listed above, each bank named as Defendant had to obtain relevant information from businesses setting up accounts including: (1) obtaining the correct business name, address, and telephone number; (2) the correct social security number; (3) the correct beneficial owner of the business; (4) valid identifications of the parties opening the account *i.e.*, valid driver's license, passport, or other relevant identification; and (5) other information that would have allowed each bank to understand the businesses for which they were opening accounts.

133.   None of the named banks requested the relevant information to open business accounts.

134.   Each bank turned a blind eye to the regulations that are specifically designed to prevent fraud.

135.   For most of the non-wire transfers made to the fake companies at Wells Fargo, Mr. Chappell physically went to Wells Fargo branches and inquired about the companies Wells Fargo has allowed to open accounts with it, and Wells Fargo told Mr. Chappell that the companies were legitimate companies.

136.   Although Wells Fargo presents the most egregious example of a bank allowing its employees to open accounts without seeking and obtaining the relevant information, all the banks named in this suit—BOA, Chase, PNC , Truist , and Santander Bank—failed to require the information needed to open the accounts.

137.   In fact, Truist later realized that it had failed to conduct the appropriate checks and told Mr. Chappel as much.

139.   Truist also told Mr. Chappell that it had closed one of the accounts it had opened for one of the fraudulent businesses, but it was too late.

140.   Had Truist and others followed the laws and regulations they needed to follow, Mr. Chappell would not have been defrauded.

141.   It would have been impossible for Mr. Chappell to have been defrauded without the bank accounts.

142.   The banks named in this suit did not conduct the relevant Customer Due Diligence ("CDD") checks, and so, they did not know that the companies formed were shell companies.

143.   Except for the one account closed at Truist, no bank named in his suit followed the ongoing monitoring requirements they should have undertaken on the accounts they opened.

## CLAIMS FOR RELIEF
### COUNT I: NEGLIGENCE/NEGLIGENCE *PER SE*
### (AGAINST ALL DEFENDANTS)

144.   Plaintiffs re-allege each preceding allegation as if those allegations were set forth in this paragraph.

145.    Each of the bank defendants had a duty to ensure that: (1) the companies for which they opened escrow and other accounts were validly existing companies consistent with federal and state laws; (2) the formation documents were valid; (3) the Registered Agents and the individuals on the bank accounts were who they represented themselves to be; (4) the businesses were legitimate businesses that could open escrow and business accounts; (5) the accounts were properly operated consistent with existing federal and state banking laws and regulations; (6) the banks exercised the proper controls in monitoring the accounts that were opened; and (7) the nature of the accounts the banks allowed to be opened and exploited required additional regulation with which the banks failed to comply.

146.    In the case of Santander Bank, an FBO, it allowed an escrow account to be opened without properly checking on the purported owners of the entities opening the account and without conducting the proper checks on the individuals who opened the account. Santander Bank did not send out an alert that individuals claiming to be associated with it had spoofed its account and were using legitimate account balances to defraud third parties like Mr. Chappell, even after Santander had discovered this fact. Santander should have known in 2019 (and earlier that its accounts and emails were being used to defraud Mr. Chappell and others. Further, had Santander Bank conducted checks when Mr. Chappell called it, Santander Bank could have avoided the fraud perpetrated on Mr. Chappell and on others.

147.    In the case of BOA, Chase, Truist, PNC, each bank opened accounts in the names of fake entities that they knew or should have known that these companies were not legitimate companies, and they should have never allowed them to open bank accounts.

148.    Each bank breached duties owed to Plaintiffs by allowing these fake companies and individuals to open non-routine bank accounts in the names of businesses that either did not exist or that were defunct at the time the accounts were opened. And each bank breached the duty of care to Plaintiffs when they allowed their institutions to be used as instruments of fraud.

149.    The banks' negligence was the proximate cause of the damages Plaintiffs suffered.

150.    Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT II: EQUITABLE FRAUD
## (AGAINST ALL DEFENDANTS)

151.    Plaintiffs re-allege each preceding allegation as if those allegations were in this paragraph.

152.    Each bank made a material misrepresentation to Mr. Chappell in that before he wired funds to the specific business account, each bank stated that the company to which Mr. Chappell was wiring was in good standing and was doing legitimate business with the bank. In addition, by allowing the companies to do business at their institutions, the banks were representing that those businesses were legitimate and that they had gone through certain checks to do business at the respective bank.

153.    The banks knew these representations were false because they knew that they had deliberately failed to conduct any of the checks required.

154.    The banks intended that Mr. Chappell rely on these representations and Mr. Chappell did rely on these representations.

155.    Mr. Chappell's reliance on the representations was justified and he had no reason to

4138-0151-5602, v. 10

doubt the bank's representations.

## COUNT III: UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

156.   Plaintiffs re-allege each preceding allegation as if those allegations were in this paragraph.

157.   All the banks earned certain fees from the transactions that Mr. Chappell undertook in the form of wire transfer fees and in the form of bonuses for opening non-routine accounts, even if those accounts were not legitimate accounts.

158.   The benefits in terms of fees and bonuses were earned under circumstances that make it unjust for the banks to keep the benefit.

159.   Equity and good conscience require restitution to Mr. Chappell.

160.   Mr. Chappell suffered damages in an amount to be proven at trial.

### JURY DEMAND

161.   Mr. Chappell demands a jury trial on all issues so triable.

**WHEREFORE,** Mr. Chappell and his company, ERA Chappell & Associates Realty, LLC, respectfully request that the Court enter judgment for them and against each of the named defendants, including, but not limited to:

A.  Pre-and-post judgment interests;

B.  Attorney's fees and costs;

C.  Punitive and exemplary damages;

D.  Restitution of all benefits received at Mr. Chappell's expense; and

4138-0151-5602, v. 10

E.  All other relief the court deems just and proper.

Dated:        New York, New York
              30 September 2024

                                        **RESPECTFULLY SUBMITTED**,

                                        **WILLIAMS LLP**

                                        */s/ T. Edward Williams, Esq.*
                                        45 Rockefeller Plaza 20th FL.
                                        New York, New York 10111
                                        Tel.:   212.417.0430 (Main)
                                                212.417.0431 (Direct)
                                        Fax:    212.417.0433
                                        Edward@williamsllp.com
                                        *Attorney for Plaintiffs*

4138-0151-5602, v. 10