UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LARRY CHAPPELL, an individual; ERA CHAPPELL & ASSOCIATES REALTY LLC, a Tennessee limited liability company,

      Plaintiffs,

-against-

BANK OF AMERICA, N.A.; J.P. MORGAN CHASE & COMPANY, N.A.; THE PNC FINANCIAL SERVICES GROUP, INC. d/b/a PNC Bank, N.A.; WELLS FARGO BANK, N.A.; TRUIST BANK f/k/a SUNTRUST BANK, N.A.; and SANTANDER BANK UK,

      Defendants.

24-CV-7056 (JGLC)

**OPINION AND ORDER**

---

**JESSICA G. L. CLARKE, United States District Judge:**

  Plaintiffs Larry Chappell and his company allege that they were scammed out of $1.5 million dollars in an elaborate scheme involving Santander bank employee impersonators and fraudulent entities that opened bank accounts at various financial institutions. Plaintiffs now bring claims for negligence, unjust enrichment, and equitable fraud against Santander Bank UK. Plaintiffs brings the same claims against the various financial institutions that allowed the fraudulent entities to open bank accounts with them. However, as described below, Plaintiffs fail to state any viable claims. Their negligence claims fail because none of the banks owe a duty of care to Plaintiffs, the banks were not unjustly enriched by Plaintiffs' transfers, and Plaintiffs fail to plead fraud claims with any particularity. Furthermore, the Court lacks personal jurisdiction over Santander. For these reasons and those stated below, the motions to dismiss are GRANTED and leave to amend is DENIED.

## BACKGROUND

**I.      Factual Background**

In January 2019, Plaintiff Larry Chappell began receiving messages from individuals purporting to represent Santander Bank ("Santander") about estate services that Santander was providing to his brother, Alan Chappell. ECF No. 93 ("SAC") ¶ 15. Communications from Santander appeared to come from Santander emails ("info@santanderaudits.com") and were marked with their logo and telephone numbers. *Id.* ¶¶ 16, 24. These communications included phone calls informing Mr. Chappell that Alan Chappell had left him around $10 million dollars in Santander's Trust and Estates Department, and they were looking to turn over the funds to Mr. Chappell. *Id.* ¶ 17.

Individuals purporting to be Grace Bishop and Randolph Brown, Santander employees, used Santander email addresses to assure Mr. Chappell that the account was real. *Id.* ¶¶ 21–26. Mr. Chappell also called Santander to confirm that the account was real. *Id.* ¶¶ 27–28. The individual purporting to be Grace Bishop provided Mr. Chappell with the account access information, which Mr. Chappell used to verify that the account had a balance of $9,858,624. *Id.* ¶¶ 28, 30–32, 34, 36, 39. Mr. Chappell confirmed that Grace Bishop was affiliated with Santander by calling Santander. *Id.* ¶ 44.

The purported Grace Bishop informed Mr. Chappell that the funds were left as part of an insurance policy, and that in order to release the funds, Grace Bishop would have to pay certain fees on Mr. Chappell's behalf. *Id.* ¶¶ 42, 46. Accordingly, between July 26, 2019, and October 17, 2022, Mr. Chappell and his company, ERA Chappell & Associates Realty, LLC, wired various amounts ranging from $5,529 to $112,500 to various bank accounts owned by the entities Akeebe Enterprises, Inc., Curtis-B Global LLC, D&J Magna Corp., Del Procurement

Services LLC, ET&M LLC, Lorojo Inc., and Raygold Global Resources LLC (collectively, the "Fraudsters"). *Id.* ¶¶ 49, 59, 66–78, 91–98, 102. Plaintiffs allege that these entities were fraudulently formed by the purported Grace Bishop. *Id.* ¶¶ 119–22. In total, Plaintiffs wired to the Fraudsters over $1.5 million dollars. *Id.* ¶ 137.

The Fraudsters held their bank accounts with Bank of America ("BOFA"), JP Morgan Chase & Co. ("Chase"), Wells Fargo Bank, N.A. ("Wells Fargo"), The PNC Financial Services Group Inc. d/b/a PNC Bank, N.A. ("PNC"), and Truist Bank f/k/a Suntrust Bank, N.A. ("Truist") (collectively "Bank Account Defendants" or "Defendants"). *See id.* ¶¶ 5–9; 126–127. Plaintiffs allege that the Bank Account Defendants failed to properly assess whether the companies that they were opening bank accounts for were legitimate entities. *Id.* ¶ 122–28. Defendants failed to check the authenticity of corporate records including EINs, certificates of incorporation and beneficial ownership reports, and did not validate provided information. *Id.* ¶¶ 50–56, 60–65, 73–75, 77, 79–80, 103–07, 112–15, 121, 123–25, 127–28, 130–36, 140–44. Moreover, Santander did not tell Mr. Chappell that there had been any cases of individuals impersonating their accounts or emails, misusing their accounts, and did not alert the public with a general announcement that its employees or former employees had been using its accounts to defraud third parties. *Id.* ¶¶ 29, 83, 87–89.

Although not alleged, it appears that Mr. Chappell has not received the $10 million estate funds or had any of his expended $1.5 million returned.

## II. Procedural History

On September 18, 2024, Plaintiffs filed a complaint alleging negligence, equitable fraud, and unjust enrichment against the Bank Account Defendants and Santander Bank UK ("Santander UK", not to be confused with "Santander"). ECF No. 1. Plaintiffs amended their

complaint on October 3, 2024, to clarify their allegations and explain that the Defendants are subject to fraud monitoring acts. ECF No. 11. Plaintiffs then filed a Second Amended Complaint on December 23, 2024, and refiled on December 30, 2024. ECF Nos. 88 and 93. On April 24, 2025, Plaintiffs sought to file a Third Amended Complaint seeking to state a respondeat superior theory of liability, which the Court denied for failure to comply with the amendment timeline and the Court's Local and Individual Rules. ECF Nos. 149, 156.

In January 2025, the Bank Account Defendants and Santander UK filed motions to dismiss. ECF Nos. 98, 101, 103, 105, 106, 108. Plaintiffs oppose. ECF No. 129 ("Opp.")

## LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. If a complaint does not state a plausible claim for relief, it must be dismissed. *Id*. at 679.

# DISCUSSION[1]

This discussion proceeds in five parts. First, the Court determines that it lacks personal jurisdiction over Defendant Santander UK. Second, the Court examines Plaintiffs' negligence claims against the Bank Account Defendants and finds that while the Uniform Commercial Code does not preempt the negligence claims, Plaintiffs have nonetheless failed to state a viable negligence claim. Third, the Court concludes that Plaintiffs have failed to state any unjust enrichment claim. Likewise, and fourth, Plaintiffs do not plead any equitable fraud claim. Finally, Plaintiffs are denied leave to amend.

## I. The Court Lacks Personal Jurisdiction Over Santander UK

Santander UK moves for dismissal under Rule 12(b)(2) for lack of personal jurisdiction. "On a Rule 12(b)(2) motion, plaintiff carries the burden of demonstrating that jurisdiction exists, and where the district court did not conduct a full-blown evidentiary hearing on a motion, the plaintiff need make only a *prima facie* showing of jurisdiction." *Penachio v. Benedict,* 461 F. App'x 4, 5 (2d Cir. 2012). "At the pleading stage, a plaintiff may make a *prima facie* showing by relying on its pleadings and affidavits, and a showing of personal jurisdiction may be established solely by allegations." *Mersen USA EP Corp. v. TDK Elecs. Inc.,* 594 F. Supp. 3d 570, 578 (S.D.N.Y. 2022). "If the Court lacks personal jurisdiction over a defendant, the claims against that defendant must be dismissed." *Id.*

"In diversity cases arising in this Circuit, personal jurisdiction is determined by the law of the state in which the district court sits, which in this case is New York." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). The analysis is threefold: First, the Court must

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

determine whether jurisdiction is appropriate under New York's long-arm statute. *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 396 (S.D.N.Y. 2021). If yes, then the Court must determine whether the exercise of jurisdiction comports with federal due process requirements—that is, whether "the defendant has certain minimum contacts with the [s]tate such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (citing *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014)). Finally, even if these two requirements are met, personal jurisdiction exists only where a plaintiff's service of process upon the defendant was procedurally proper. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344, 350, (1999); *In re Kalikow*, 602 F.3d 82, 92 (2d Cir. 2010).

For the first step of this analysis, the applicable long-arm statute is CPLR 302(a)(1). Under this statute, a court "may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state," so long as the plaintiffs' "cause of action aris[es] from" that "transact[ion]." N.Y. C.P.L.R. 302 (a)(1) (McKinney 2025). In other words, in determining whether personal jurisdiction may be exercised under CPLR 302(a)(1), "a court must decide (1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'arises from' such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir.2007) (citing *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006)).

Plaintiffs fail to show either requirement. First, regarding whether Santander UK transacts any business in New York, Plaintiffs' conclusory allegations in the SAC that Santander UK provides services in New York, SAC ¶ 10, do not suffice to meet their burden against the facts in Santander UK's sworn affidavit and attached annual reports. ECF Nos. 110, 110-1, 110-2. Santander UK has affirmed that Santander UK does not providing banking services in the US

6

or New York. ECF No. 110 ¶ 6. Santander UK has also provided a list of subsidiaries through its annual report, which does not include the Santander Holdings USA mentioned in the allegations, SAC ¶ 10, or any subsidiary which appears to do business in New York. ECF No. 110-1 at 196–97.

Plaintiffs' response does nothing to address these affirmations. Plaintiffs attempt to attack the Santander UK affidavit, claiming the statements therein are false. Opp. at 35. Plaintiffs note that in one corporate document, Santander UK provided a New York agent and telephone number. Opp. at 35–36. But the affidavit specifies that Santander UK has debt securities listed in the New York stock exchange, ECF No. 110 ¶ 7, and Plaintiffs make no showing that the New York contact is in any way relevant to bank transactions. Aside from pointing out that corporate document, Plaintiffs also point out Santander UK's status as a Foreign Private Issuer, Opp. at 36, but they fail to explain how that shows Santander UK's operations in New York. They also rely on the fact that Santander UK has non-banking services in the United States, *id.* at 37, but again, they do so with no showing of how that is relevant specifically to New York. Other than these contentions, Plaintiffs offer nothing to indicate that Santander UK provides banking services in New York.

Moreover, the allegations contain no facts meeting the second requirement of CPLR 302(a)(1): that the cause of action arises from a business transaction in the state. *Best Van Lines, Inc.*, 490 F.3d at 246. In fact, the Second Amended Complaint contains no allegations showing that *any* of the events took place in New York. As such, Plaintiffs fail to show that personal jurisdiction is proper under New York's long-arm statute.

Although a full analysis of the constitutional and service of process prongs are unnecessary, Plaintiffs fail to satisfy them as well. Because Plaintiffs fail to allege that Santander

7

UK conducts business in New York or that any events giving rise to the cause of action took place in New York, Plaintiffs cannot show the constitutionally required "minimum contacts" that defendants must have with the forum state. *See World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League*, No. 24-CV-1066 (MMG), 2024 WL 4893266, at *6 (S.D.N.Y. Nov. 26, 2024). Likewise, Plaintiffs have failed to show that they served any agent for Santander UK and instead only show that they served some agent in Melville, New York, for "Santander" or "Santander Bank." ECF Nos. 28, 53. This location is not even the service address listed on the Santander UK corporate forms referenced by Plaintiffs in their opposition. *See* Opp. at 36. Nor do Plaintiffs explain how, under laws governing service of foreign corporations, it was proper for Plaintiffs to serve a UK entity in Melville, New York. Accordingly, the Court lacks personal jurisdiction over Santander UK.

## II.     Plaintiffs Do Not State Any Negligence Claim

Plaintiffs bring negligence claims against the remaining banks for allowing the Fraudsters to open accounts with their branches, which then facilitated Plaintiffs' wire transfer of funds to these accounts. *See* SAC ¶¶ 119–39; 144–50. Defendants argue that the negligence claims are preempted by Article 4-A of the New York Uniform Commercial Code (the "UCC"), that the claims are time-barred, and that the claims must fail on the merits because Defendants owed Plaintiffs no duty of care. The Court finds that while the UCC does not preempt the question and the claims are not all time-barred, the negligence claims fail for lack of duty of care.

UCC Article 4-A covers "Fund Transfers," defined as:

> [T]he series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order.

N.Y. UCC LAW § 4-A-104(1) (McKinney 2025). The provision "is a comprehensive scheme enacted to govern electronic wire transfers." *Phil & Kathy's, Inc. v. Safra Nat'l Bank of New York,* 595 F. Supp. 2d 330, 332 (S.D.N.Y. 2009). For this reason, New York courts recognize that Article 4-A is the "exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 801 (2d Cir. 2011) (quoting N.Y. U.C.C. LAW § 4–A–102 cmt.). A "resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article." N.Y. U.C.C. LAW § 4-A-102 cmt; *see also Essilor Int'l SAS v. J.P. Morgan Chase Bank, N.A.*, 650 F. Supp. 3d 62, 83–84 (S.D.N.Y. 2023) ("Article 4A precludes customers from bringing common law claims inconsistent with the statute."); *Sheerbonnet, Ltd. v. Am. Express Bank, Ltd.*, 951 F. Supp. 403, 407 (S.D.N.Y. 1995) (noting that a plaintiff "whose conflict arises out of a funds transfer should look first and foremost to Article 4-A for guidance in bringing and resolving their claims," and inconsistent common law claims must be dismissed).

Plaintiffs inexplicably contend that Article 4-A does not preempt the negligence claims here because "no fund transfers occurred." Opp. at 28–30. Plaintiffs argue that the SAC instead "alleges that Defendants opened accounts for fraudsters when Defendants knew (or should have known) that the fraudsters were going to use the accounts to exploit the elderly or some other vulnerable people." *Id.* at 30. The SAC, however, explicitly states that what is at issue are "funds Mr. Chappell wired to Defendants." SAC ¶ 116; *see also id.* ¶¶ 49, 66–68, 78, 92, 95, 98, 102. In any case, if no fund transfers occurred, Plaintiffs suffered no injury and lacks standing to sue the Defendants.

Plaintiffs also argue that the SAC's allegations are premised on acts unrelated to wire transfers—namely, the opening of the Fraudster's accounts. Opp. at 30–31. But again, if no fund transfers occurred to those accounts, Plaintiffs would lack standing to sue Defendants at all. The wire transfers are not only related to the claim but central to the claim. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174 (2d Cir. 2005) ("Injury-in-fact is an indispensable requirement for standing.").

That said, Article 4-A does not govern *all* claims in which wire transfers are central. Rather, Article 4-A "controls how electronic funds transfers are conducted and specifies certain rights and duties related to the execution of such transactions." *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89 (2d Cir. 2010). Claims that "are not about the mechanics of how a funds transfer was conducted may fall outside of this regime." *Id.* Thus, "the critical inquiry in determining whether Article 4-A has preempted a common law cause of action is whether its provisions protect against the type of underlying injury or misconduct alleged in a claim." *Beck v. Metro. Bank Holding Corp.*, 747 F. Supp. 3d 442, 454 (E.D.N.Y. 2024).

Here, the alleged misconduct does not have to do with how the transfer of funds was conducted. Instead, the SAC reflects that the Plaintiffs authorized the transfer of the funds and that Defendants processed the transfer with no issue. SAC ¶¶ 49, 59, 66–69, 78, 92, 95, 98, 102. The underlying issue is instead whether the accounts to which the funds were transferred should have existed in the first place. No provision in Article 4-A covers this kind of problem. Indeed, Article 4-A was not enacted to cover this kind of problem, but instead to "treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment." *Ma*, 597 F.3d at 89. Plaintiffs, here, could have written a

10

paper check to the Fraudsters, and the underlying misconduct would remain. For that reason, the UCC does not preempt the tort claims here.

That said, Plaintiffs' claims are time-barred against certain Defendants. In New York, an action to recover damages for injury to property must be commenced within three years from the time the cause of action accrues. *See* N.Y. C.P.L.R. § 214(4) (McKinney 2025). "A negligence claim accrues on the date of injury, that is, when the cause of action is 'complete' and a plaintiff may plead all the required elements" of his or its claim. *Coleman & Co. Sec. v. Giaquinto Fam. Tr.*, 236 F. Supp. 2d 288, 299 (S.D.N.Y. 2002). Plaintiffs' alleged injury occurred on the date of each wire transfer. Here, the SAC alleges that the payments made through various banks occurred between 2019 and 2023. SAC ¶ 153. The original complaint was filed on September 18, 2024. ECF No. 1. Therefore, all claims based on wire transfers made before September 18, 2021 are time-barred.

Plaintiffs' negligence claims against the remaining Defendants also fail because Plaintiffs have not alleged that Defendants owed Plaintiffs any duty of care. "To establish a prima facie case of negligence under New York law, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006). "The threshold question in any negligence action is: does defendant owe a legally recognized duty of care to plaintiff?" *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (2001).

Plaintiffs did not hold any account with Truist, BOFA, Wells Fargo, Chase, or PNC. Instead, Plaintiffs allege that the duty arises from the Defendants' failure to screen the Fraudsters before allowing them to open accounts. SAC ¶¶ 119–36; 144–50. In New York, the general rule is that "[b]anks do not owe non-customers a duty to protect them from the

intentional torts of their customers." *Lerner,* 459 F.3d at 286. There are exceptions to the general rule, such as when a bank has "notice or knowledge that [a trust account] diversion is intended or being executed." *Id.* at 287. However, no case has suggested that New York law "imposes upon banks a duty to protect non-customers from a fraud involving depository accounts." *In re Agape Litig.,* 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010).

Plaintiffs cite to three inapposite cases for the idea that financial entities can owe a duty to third parties: one case for negligent supervision where the defendant financial entity enabled the fraudster to harm plaintiff despite having specific knowledge that the fraudster had a propensity for fraud; one case where, among other facts, the financial entity's subsidiary helped transport women like the plaintiff to be trafficked; and one case where passengers crowded a post-flight baggage area maintained by defendant, causing plaintiff to be hurt. *See* Opp. at 17–24 (citing *Moore Charitable Foundation v. PJT Partners, Inc.* 40 N.Y.3d 150 (2023); *Doe v. Deutsche Bank Aktiengesellschaft, et al.*, 671 F. Supp. 3d 387 (2023); and *Stagl v. Delta Airlines, Inc.,* 52 F.3d 463 (2d Cir. 1995)). None are applicable to this case. Plaintiffs do not allege that Defendants had knowledge of the Fraudsters' propensity for fraud. Defendants are not being sued for negligent supervision. And Plaintiffs do not allege that Defendants took active steps—or had subsidiaries take active steps—to facilitate the fraud.

Plaintiffs additionally argue that Defendants violated regulations of the Patriot Act and Bank Secrecy Act by failing to screen the Fraudsters before they opened accounts, and that accordingly, they have breached a duty of care. *See* SAC ¶¶ 140–44. However, these acts "do[] not create a private right of action, [so] the Court can perceive no sound reason to recognize a duty of care that is predicated upon the statute[s'] monitoring requirements." *In re Agape Litig.,* 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010) (finding that the Bank Secrecy Act's did not create a

private right of action and therefore its monitoring requirements did not provide a basis for imposing a duty of care upon the defendant) (citing *Aiken v. Interglobal Mergers and Acquisitions,* No. 05–CV–5503, 2006 WL 1878323, at *2 (S.D.N.Y. Jul. 5, 2006) (refusing to announce duty of care because neither the Bank Secrecy Act or Patriot Act affords a private right of action)). Plaintiffs have failed to allege duty of care, and their negligence claims are accordingly dismissed.

### III. Plaintiffs Do Not State Any Unjust Enrichment Claim

Plaintiffs likewise fail to state any claim for unjust enrichment. "The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 186 (2d Cir. 2023) (quoting *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004)). "The benefit that is conferred must be 'specific' and 'direct' in order to support an unjust enrichment claim." *Graham v. Take-Two Interactive Software, Inc.*, No. 19-CV-02183 (GBD) (SDA), 2019 WL 8111915, at *2 (S.D.N.Y. Nov. 25, 2019), *report and recommendation adopted,* 2020 WL 408408 (S.D.N.Y. Jan. 24, 2020).

Plaintiffs fail to plead how any of the Bank Account Defendants were enriched at Plaintiffs' expense. Plaintiffs do not allege that Defendants directly received any portion of the funds that Fraudsters caused Plaintiffs to relinquish. *See Curry Mgmt. Corp. v. JPMorgan Chase Bank, N.A.*, 643 F. Supp. 3d 421, 430 (S.D.N.Y. 2022) (dismissing unjust enrichment and analogous money had and received claims where plaintiff failed to plead any facts suggesting the bank benefitted a transfer of funds to one of its account holders); *Pinecover v. J.P. Morgan Chase Bank, N.A.,* 592 F. Supp. 3d 212, 229 (S.D.N.Y. 2022) ("The FAC, however, does not allege that

either KeyBank or Wells Fargo benefitted from the deposit of the stolen funds into customer accounts at those banks. Funds held in the account of a bank's customer do not represent a benefit to a bank. Instead, they result in the bank's incurring a debt to the account holder.").

To the extent that Defendants were enriched by any fees and bonuses arising out of the Fraudsters' accounts' creations, *see* SAC ¶¶ 159, 165, none of that money is alleged to have come from Plaintiffs' pockets. Plaintiffs do allege that that the transfers came with an assessment of fees, *id.* ¶ 108, but Plaintiffs do not allege that they—rather than the account-bearing Fraudsters—paid the fees. Indeed, at least one Bank Account Defendant represents that they do not charge wire transfer fees to non-account holders who send wire transfers to their account holders. *See* ECF No. 102 at 24. And Plaintiffs themselves agree that the fees were collected from wire transfer amounts *after* the deposits were made, Opp. at 35, in other words, after the money became property of the Fraudsters. Defendants may have been enriched by Fraudsters' acts, but not by Plaintiffs themselves. And neither the Court nor Plaintiff identify any case law where in these circumstances, a claim for unjust enrichment survives. Accordingly, the claims are dismissed.

## IV. Plaintiffs Do Not State Any Equitable Fraud Claim

Plaintiffs claim equitable fraud, alleging Defendants concealed the fact that they had opened accounts for the Fraudsters without completing fraud screenings. SAC ¶ 152. Plaintiffs have failed to allege these claims with the requisite specificity to proceed.

To state a claim for fraud under New York law, a plaintiff must allege: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Saltz v. First Frontier, LP*, 782 F.

Supp. 2d 61, 75 (S.D.N.Y. 2010) (quoting *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001)). To state a claim for fraudulent concealment under New York law, a plaintiff must allege: "(1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to make such disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and (6) damages." *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 314 (S.D.N.Y. 2013). Equitable fraud differs from fraud and fraudulent concealment only in that it "does not require a showing of intent to deceive or defraud." *Frommert v. Becker*, 153 F. Supp. 3d 599, 608 (W.D.N.Y. 2016) (internal citations omitted).

Under Federal Rule of Civil Procedure 9(b), "[c]laims concerning fraud are subject to heightened pleading standards." *Nasso v. Bio Reference Lab's, Inc.,* 892 F. Supp. 2d 439, 446 (E.D.N.Y. 2012); FED. R. CIV. P. 9(b). "[I]n order to comply with Rule 9(b), the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).

Here, Plaintiffs have generally failed to allege that Defendants made any representation at all to Plaintiffs regarding the Fraudsters' accounts. The exception is Wells Fargo. As for the remaining Defendants, Plaintiffs attempt to characterize Defendants' opening of the accounts and processing of the wire transfers as "concealment," but Plaintiffs do not allege that they ever asked the Defendants about whether the accounts had been screened or verified. In other words, Plaintiffs do not plead that they ever gave Defendants the opportunity to conceal any fact. Moreover, Plaintiffs fail to allege that Defendants had a duty to disclose material facts, as required for a claim of fraudulent concealment. *See De Sole,* 974 F. Supp. 2d at 314.

Regarding Wells Fargo, Plaintiffs have pled that Chappell asked Wells Fargo about the companies that had open accounts, and that Wells Fargo informed Chappell that the companies were legitimate. SAC ¶ 145. But even this does not meet the Rule 9(b) requirements for particularity. It is unclear when the statements were made, who made the statements, whether the speaker was a proper representative of Wells Fargo, which companies Chappell was inquiring about, and whether Wells Fargo's statements were made with the intent of inducing reliance. *See Lerner,* 459 F.3d at 290.

In any case, even if Plaintiffs could amend the pleading to include these details, a claim of equitable fraud would not apply to this case. Equitable fraud "involves the obtaining or retention of a benefit as a result of a breach of fiduciary or equitable duty, even in the absence of an actual intent to defraud." *Frommert,* 153 F. Supp. 3d at 608. The underlying principle is that "it would be inequitable and unconscientious for a party to insist on holding the benefit of a contract which he has obtained through misrepresentations, however innocently made." *Id.* (citing *Hammond v. Pennock*, 61 N.Y. 145, 152 (1874)). But as discussed in the previous sections, Plaintiffs have failed to plead that Defendants owed them any duty of care, or that Defendants were unjustly enriched at Plaintiffs' expense. Plaintiffs do not allege how Defendants "obtain[ed] or re[tained] … a benefit as a result of a breach of fiduciary or equitable duty." *Id.* And Plaintiffs do not explain how Defendants "hold[] the benefit of a contract which [they have] obtained through misrepresentations." For these reasons, the equitable fraud claims are dismissed.

## V.      Leave to Amend is Denied

Plaintiffs seek leave to amend. Opp. at 39. Plaintiffs have already amended the Complaint in response to several motions to dismiss. *See* ECF Nos. 55, 65, 67, 73. Plaintiff's present request

is cursory and fails to state what Plaintiffs would amend that would render amendments non-futile. *See Carroll v. Trump*, 590 F. Supp. 3d 575, 580 (S.D.N.Y. 2022) (reiterating that courts deny leave to amend for futility). Accordingly, leave to amend is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED and Plaintiffs are DENIED leave to amend. The Clerk of Court is directed to terminate all outstanding ECFs and close the case.

Dated: July 11, 2025
New York, New York

SO ORDERED.

*Jessica Clarke*

JESSICA G. L. CLARKE
United States District Judge